UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ALLYSON O.,

                              Plaintiff,

        -against-                                    5:17-CV-0713 (LEK)

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                              Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

        Plaintiff Allyson O. seeks supplemental security income ("SSI") on account of a

disability. The period of disputed disability at issue here is September 12, 2012 through

December 31, 2012. Dkt. No. 8 ("Record") at 10. This case is the second time Plaintiff has

applied for disability insurance benefits. In a previous decision of the Social Security

Administration ("SSA"), she was found not disabled through September 11, 2012. Id. at 112. On

June 30, 2017, Plaintiff filed an action in this Court pursuant to 42 U.S.C. § 405(g) challenging

the SSA Administrative Law Judge's denial of her new claim. Dkt. No. 1 ("Complaint"). Both

parties have filed briefs. Dkt. Nos. 11 ("Plaintiff's Brief"), 14 ("Defendant's Brief"). For the

reasons that follow, the ALJ's judgment is remanded for further proceedings.

## II.   BACKGROUND

### A.  Plaintiff's Ankle Injury

        On September 21, 2010, Plaintiff was involved in a serious automobile accident causing a

severely comminuted fracture of the right distal tibia, accompanied by multiple displaced free

fragments and a fracture of the right fibula. Id. at 297, 309. At the hospital that evening, according to orthopedist Dr. Ross Taylor, Plaintiff reported dull, aching pain in her ankle "prohibitive of motion." Id. at 309. However, Plaintiff otherwise had "[f]ull range of motion, [and] complete stability [in her] bilateral hips, knees, left ankle, and hindfoot, bilateral midfoot and forefoot joints." Id. at 310. That same day, Dr. Taylor performed a surgery of open reduction internal fixation on Plaintiff's distal fibula fracture and applied a delta external fixator frame. Id. at 307–08, 312. As of her September 22, 2010 discharge, Plaintiff "was ambulating with crutches," id. at 297, and was advised to use "crutches or walker," id. at 297, 314, 324. A scan following this initial surgery showed continued heavily comminuted distal tibia fracture, hardware placement, and near anatomic alignment. Id. at 297, 304–306. In a follow-up surgery on October 11, 2010, Dr. Taylor performed an open reduction internal fixation of Plaintiff's tibial pilon structure, and removed the external fixator frame. Id. at 319–21.

Over the next year, Plaintiff was repeatedly examined by Dr. Taylor for ongoing right ankle pain; she was prescribed Neurontin and Vicodin and was repeatedly advised to continue a non-weightbearing regime. Id. at 396–97, 402–10. At a February 2011 appointment, Dr. Taylor reported minimal to no swelling around the right ankle, and noted that Plaintiff was to wear a controlled-ankle-motion (CAM) walking boot when standing and walking, and said that "she may progress to full weightbearing on the right using walker or cane for assistance." Id. at 405. In the same examination, though, Dr. Taylor found that "no subtalar motion" was "elicitable on the right [ankle]." Id. at 405. In April 2011, Plaintiff had "no ankle range of motion" and was provided an ankle-stabilizing orthosis (ASO) brace. Id. at 406. Later evaluations by Dr. Taylor's

medical group note the use of a controlled-ankle-motion (CAM) boot in September 2011 and a lace-up ankle brace in October 2011. Id. at 409, 398, 387.

In July 2011, Dr. Taylor reported that Plaintiff's gait was antalgic, but that there was no swelling around the right ankle. Id. at 396–97. But five months later, in September 2011, "[n]umerous" swelling ("edema") was reported. Id. at 409. At appointments with Dr. Taylor in October 2011, Plaintiff "demonstrate[d] no elicitable motion of the right ankle and hindfoot." Id. at 398–99. She had continued pain and tenderness in her right ankle, but no swelling. Id. After the October 2011 appointment, Plaintiff moved to South Carolina and discontinued treatment with Dr. Taylor. Id. at 398–99.

In March 2012, about six months before the period of disputed disability, Dr. Raghu Boppana reported that Plaintiff's ankle injury was "managed with [a] splint and pain meds." Id. at 387. Plaintiff does not appear to have sought treatment during the disputed disability period between September and December 2012. However, in June 2013, around six months after this period, however, Plaintiff saw a new primary care physician, Dr. Jill Williams, for "worsening neuropathy in right leg." Id. at 462.

Dr. Williams referred Plaintiff to Dr. Matthew Baird, who evaluated Plaintiff's leg and ankle in September 2013. Id. at 496–98. Dr. Baird noted Plaintiff's use of a walker and walking boot, and found that her ankle range of motion was "significantly limited" with only a ten percent dorsiflex and a five percent plantar flex. Id. at 496–97. Dr. Baird noted that Plaintiff "has really not been able to walk or move the ankle since [the car crash]," and that there was "almost complete obliteration of the joint." Id. In October 2013, Plaintiff saw Dr. Thomas Anderson, who assessed Plaintiff's "extremely horrendous" fracture and "continuous" pain. Id. at 493. Dr.

Anderson doubted that joint fusion would resolve Plaintiff's pain. Id. at 494. X-rays showed that the plates installed around the ankle were in good position. Id. During clinical examination, Plaintiff displayed pain to palpation, limitation of motion, and diminished sensation, but Dr. Anderson also noted that Plaintiff "moves the ankle fairly well." Id. at 494.

In December 2013, Dr. Thomas Jarecky examined Plaintiff. He found that she was suffering from "increasing right foot pain" and reflex sympathetic dystrophy. Id. at 499–501. Dr. Jarecky recommended that she undergo lumbar sympathetic blocks, which she did. Id. at 499–501. Plaintiff was in a wheelchair at this time. Id. at 499.

In a January 2014 statement, Dr. Williams found that Plaintiff could not perform work involving anything more than basic one and two-step processes, and that even with such basic work, she would (1) probably have to rest away from her work station for significantly more than an hour each work day; (2) probably miss more than three days of work per month; and (3) probably have concentration problems sufficient to frequently interrupt work tasks. Id. at 427–28. Dr. Williams, from the records available, explained that Plaintiff was "so impaired" from approximately September 2010, the date of the accident. Id.

Dr. Anderson also provided a statement regarding Plaintiff in January 2014. Id. at 429. Dr. Anderson stated that Plaintiff would not be able to undergo more than a one or two-step process that involved her walking or standing for any length of time or any lifting. Id. Dr. Anderson reported that the claimant suffered from severe ankle arthritis, subtalar arthritis and sympathetic nerve pain in the right lower extremity, and swelling. Id. Further, Plaintiff "would definitely have a lot of trouble getting through an eight-hour day and would be at home immediately afterwards elevating [her ankle] and in pain. She would probably have a lot of

intermittent loss of time . . . [S]he would probably miss more than four days a month very easily." Id. Plaintiff's required pain medication would also affect her concentration. Id. Finally, Dr. Anderson reported that Plaintiff's lower extremity had a "30% impairment rating . . . based on lack of motion and continued swelling and pain," and he "th[ought] that her impairment really began at the time of her motor vehicle accident." Id.

In April 2014, following the failure of more conservative treatment, Plaintiff's right leg was amputated below the knee, and she was transferred to rehabilitation. Id. at 430–48.

In October 2014, Dr. Anderson authored a statement reflecting upon Plaintiff's condition when he "first saw her" in October 2013. Id. at 505. Dr. Anderson said that Plaintiff had "an almost completely obliterated joint, as documented by x-ray, with chronic residual swelling, tenderness, sensory abnormalities, restricted dorsiflexion and plantear flection, and pain." Id. Further, Plaintiff "could only walk with a walker or crutches." Id. Dr. Anderson was "quite sure that she would not have been able to handle any work that involved anything more than brief standing and walking, and standing and walking would require a walker or two crutches. It is most probable that [the] condition persisted at this level of restriction since the day of the accident." Dr. Anderson explained that the ankle "functioned so poorly that it required amputation." Id.

### B. Obesity

During this period of alleged disability, Plaintiff also suffered from morbid obesity. When hospitalized in October 2010, examiners reported that Plaintiff was morbidly obese. Id. at 400. In June 2011, Dr. Taylor reported that Plaintiff, who was 65 inches tall, weighed 300 pounds. Id. at

407. In October 2013, Dr. Anderson recorded a weight of 329 pounds for a body mass index of 54.74. Id. at 493.

### C. Mental Health

In June 2013, six months after the disputed disability period, at an appointment focused on worsening neuropathy in Plaintiff's right leg, Dr. Williams also conducted a "Depression Screening." Id. at 462. Plaintiff reported that on a daily basis she felt hopeless, tired, and that she was a failure; she also had thoughts that she would be better off dead or that she should hurt herself in some way. Id. Plaintiff also reported that she had stopped going out of her house and cried everyday. Id. Dr. Williams found that Plaintiff's had "Severe Depression" and noted that a Suicide Risk Assessment should be considered. Id. Plaintiff was prescribed Wellbutrin, an antidepressant. Id. at 463.

In December 2013, Dr. Thomas Jerecky remarked that Plaintiff was well-oriented with a normal mood and affect. Id. at 499. But Dr. Williams reiterated the depression diagnosis in January 2014. Id. at 427.

Plaintiff required psychiatric hospitalization in September and October 2015 for depression and suicide risk. Id. at 15, 517–35. However, in November and December 2015, Ellis Mental Health providers reported that Plaintiff's mood and affect were stable, and that she was functioning close to baseline. Id. at 507, 536–42.

### D. Procedural History

The SSA initially denied her new claim, for the period September 12, 2012 through December 31, 2012, on May 19, 2014, and again, upon reconsideration on July 1, 2014. Id. at 10,

157. Plaintiff then requested a SSI eligibility hearing, which was held before Administrative Law Judge ("ALJ") Carl E. Stephan on February 2, 2016. Id. at 10.

On February 2, 2016, ALJ Stephan held a hearing regarding Plaintiff's SSI eligibility for the period beginning September 12, 2012. Id. at 79–104. At the hearing, Plaintiff testified that she worked as an electronic technician for twenty years until the September 21, 2010 car crash, repairing cable line gear from telephone poles. Id. at 85–86. Previously, she had worked as a cashier at Dunkin Donuts. Id. at 86.

Plaintiff also discussed her April 25, 2014 amputation, and how she had received her prosthetic leg in January 2016. Id. at 87. Plaintiff reported that she could only stand for fifteen minutes and could walk only a few feet. Id. She had continuous pain in the stump of her leg, even when sitting. Id. at 87–88. Plaintiff also said that she had constant pain in her hips, sometimes a "ten," sometimes a five. Id. at 97–98. To deal with pain, Plaintiff took gabapentin and lortab, and also rested and elevated her leg. Id. at 88. The medications affected her concentration and sleep. Id. Plaintiff explained that she had traveled from her truck in the parking lot to the hearing via wheelchair and would not have been able to walk the distance without assistance. Id. at 98–99. In describing her day-to-day activities, Plaintiff explained that she spent "about all day" lying down or in her reclining chair, except for going to the bathroom. Id.

Plaintiff reported that she could bathe herself in a shower chair and dress herself part way, with her husband helping put her pants over her prosthetic. Id. at 92. Plaintiff reported that she didn't do "much" in the way of chores, and was unable to stand long enough to cook a complete meal, but that she did wash dishes while sitting down in a chair, and could ride in an electric cart

at the grocery store. Id. at 93. Her husband handled laundry and cleaning duties. Id. Plaintiff reported sometimes watching TV and using Facebook on her phone. Id. at 94.

Plaintiff also explained that her mental health problems dated back five years, and that in September 2015 she had five days of psychiatric hospitalization brought on by stress. Id. at 90–91. Plaintiff reported that since then, she had been seeing a psychiatrist and counselor regularly and was taking effexor, amitripyline, and buspar for psychiatric issues. Id. at 91–92.

Plaintiff said that she has "flashbacks," that she doesn't "want to live because [her] life has changed so drastic[ally]," that she is overwhelmed with anxiety twenty-four hours a day, and that she has mood swings. Id. at 94–95. Plaintiff also explained that she would usually cry once or twice a day for ten or fifteen minutes, but suffered occasional all-day crying episodes. Id. at 95–96. Plaintiff reported avoiding people and society, sometimes staying in bed for thirty days, only getting up to go to the bathroom. Id. at 97. In addition, her medications affected her memory and concentration, and made her "tired all the time." Id. at 97, 99.

Plaintiff's husband Robert also testified that Plaintiff was "very withdrawn and depressed, " "doesn't want to get out of bed," and "wanted to commit suicide." Id. at 101–02. Robert noted that Plaintiff had difficulties with her concentration and memory, and that she suffered from mood swings. Id at 102.

### E. Standard for Benefits

According to SSA regulations, a disability is defined as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual

seeking disability benefits "need not be completely helpless or unable to function." <u>De Leon v. Sec'y of Health and Human Servs.</u>, 734 F.2d 930, 935 (2d Cir. 1984). In order to receive disability benefits, a claimant must satisfy the requirements of a five-step sequential evaluation process. § 404.1520(a)(1). If the ALJ is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 CFR § 404.1520(a)(4). Otherwise, the ALJ will proceed to the next step. <u>Id.</u>

At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful work activity." § 404.1520(a)(4)(i). If so, the claimant is not disabled under SSA regulations. <u>Id.</u> At step two, the ALJ must determine whether the claimant has an impairment, or combination of impairments, that is "severe," e.g., that imposes significant restrictions on the claimant's ability to perform basic work activities. § 404.1520(a)(4)(ii). If the claimant does not have such an impairment, the claimant is not disabled under SSA standards. <u>Id.</u> At step three, the ALJ considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in Appendix 1 of Subpart P of § 404. § 404.1520(a)(4)(iii); 20 C.F.R., Pt. 404, Subpt. P, App. 1. If it does not, the ALJ moves on to step four, and reviews the claimant's residual functioning capacity ("RFC") and past relevant work. § 404.1520(a)(4)(iv). A claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work. <u>Id.</u> If the claimant cannot perform her past relevant work, the ALJ decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. § 404.1520(a)(4)(v). If appropriate work does not exist, then the ALJ considers the claimant to be disabled. <u>Id.</u> In the first four steps, the claimant bears the burden of proof; at step five, the burden

shifts to the SSA. <u>Kohler v. Astrue</u>, 546 F.3d 260, 265 (2d Cir. 2008) (quoting <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996)).

**F. The ALJ's Decision**

On March 3, 2016, ALJ Stephan issued a decision finding that Plaintiff was not disabled from September 12, 2012 through December 31, 2012. <u>R.</u> at 18.

The ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2012, meaning that Plaintiff must establish disability prior to that date for entitlement disability insurance benefits.

Under the first step of the disability evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity from September 12, 2012 through December 31, 2012. <u>Id.</u> at 12.

Under the second step, the ALJ found that Plaintiff had the following severe impairments: history of severely comminuted fracture of the right distal tibia pilon requiring internal fixation; open reduction and internal fixation of a right fibula fracture; and obesity. <u>Id.</u>

Under the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.125 and 404.1526). R. at 10. In reaching this decision, the ALJ said he considered the musculoskeletal impairment of Listing 1.08 of Appendix 1. <u>Id.</u> at 13–14. The ALJ found that even after the crash, Plaintiff retained the ability to walk, noting that Plaintiff did not undergo the amputation until April 2014.

Under the fourth step, the ALJ found that, during the relevant period, Plaintiff had the residual functional capacity to perform the full range of sedentary work, as well as postural activities occasionally. Id. at 14. While the ALJ did not doubt the truthfulness or sincerity of the Plaintiff's testimony, the ALJ did not find that Plaintiff experienced the severe symptoms described at the hearing prior to December 31, 2012. Id. at 15. In making this determination, the ALJ noted that "no opinion evidence" predated December 31, 2012. Id. at 16. It was one year after that date, in January 2014, that Dr. Anderson stated that Plaintiff was unable to stand or walk for any length of time or lift. Id. The ALJ noted Dr. Anderson's January 2014 assessment that Plaintiff suffered from a "30% impairment rating" dating back to the time of her accident. Id. However, the ALJ "did not find that a 30% impairment rating would suggest an individual is incapable of performing work activity, particularly that of a sedentary nature." Id. The ALJ further noted that the January 2014 report was rendered several months before Plaintiff underwent amputation, "when her symptoms were likely at their worst." Id. Accordingly, the ALJ did not find that Dr. Anderson's January 2014 report "shed[] any particular light on [Plaintiff's] functional capacities" for the period in dispute. Id. The ALJ also did not find that Plaintiff experienced severe psychiatric symptoms during the period in question, because Plaintiff "did not begin psychiatric treatment until September 2015." Id. at 15.

In determining that Plaintiff had residual functional capacity to perform the full range of sedentary work, the ALJ gave "considerable weight" to Dr. Anderson's October 2014 report. Id. at 16. In that report, Dr. Anderson said that Plaintiff, following the crash, was left with residual swelling, tenderness, limitation of motion, sensory abnormalities, and pain, and able to walk only with the use of crutches or a walker. Id. The ALJ noted that Dr. Anderson found that Plaintiff

was able to stand and walk for no more than a couple hours in an eight-hour day. Id. Dr. Anderson's opinion, rendered two years after the period in dispute, indicated, according to the ALJ, "that [Plaintiff's] ability to perform sedentary work activity remains intact." Id.

The ALJ found that for the period September 12, 2012 through December 31, 2012, Plaintiff was unable to perform any past relevant work, since that work required her to engage in periods of standing and walking throughout the work day. Id. at 17.

Finally, under the fifth step, considering the Plaintiff's education, education, work experience, and residual functional capacity, the ALJ found that there were jobs that existed in significant numbers in the national economy that the Plaintiff could have performed. Id. at 17–18.

Based on these findings, the ALJ concluded that Plaintiff was not disabled for purposes of the Social Security Act for the period September 12, 2012 through December 31, 2012. Id. at 18.

Plaintiff appealed the ALJ's decision, and the SSA's Appeals Council denied review of the decision on May 8, 2017. Id. at 1–3.

III.    STANDARD OF REVIEW

When a district court reviews an ALJ's decision, it must determine whether the ALJ applied the correct legal standards and whether his/her decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Thus, a court will defer to the ALJ's decision if it is supported by substantial evidence, "even if [the

court] might justifiably have reached a different result upon a *de novo* review." <u>Sixberry v. Colvin</u>, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting <u>Valente v. Sec'y of Health & Human Servs.</u>, 733 F.2d 1037, 1041 (2d Cir. 1984)). However, a court should not uphold the ALJ's decision—even when there is substantial evidence to support it—if it is not clear that the ALJ applied the correct legal standards. <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987).

## IV. DISCUSSION

Plaintiff argues that the ALJ erred in (1) finding that Plaintiff did not need a walker or crutches for ambulation during the relevant period, and (2) failing to properly evaluate Dr. Anderson's January and October 2014 opinions. The Court addresses each issue in turn.

### A. The ALJ's Determination that Plaintiff Did Not Need A Walker or Crutches During Relevant Period

The third step of the five-part test requires a determination of whether Plaintiff had an impairment listed in Appendix 1. 20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment. If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits." <u>Dixon v. Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995).

Listing 1.02 of Appendix 1 outlines the conditions required to establish a disabling impairment of a joint. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02. To constitute an Appendix 1 impairment, Plaintiff's ankle condition must qualify as a "[m]ajor dysfunction of a joint(s)," characterized by an "inability to ambulate effectively as defined in 1.00(B)(2)(b)." <u>Id.</u> Examples

of "ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes." Id. § 1.00(B)(2)(b)(1). In other words, if Plaintiff can establish that she required the use of a walker or two crutches in the disputed period, then she establishes disability under Listing 1.02.

Plaintiff argues that the ALJ erred by assessing Plaintiff's impairment under Listing 1.08 (soft tissue injuries), instead of Listing 1.02 (major dysfunctions of a joint), Pl. Br. at 5–6. Plaintiff also argues that she satisfies Listing 1.02 on the basis that she needed a walker or crutches to walk during the relevant period. Id. at 7–8.

As to Plaintiff's first argument, the ALJ's mention of Listing 1.08 as opposed to 1.02 appears to have been a typographical error, and on its own does not warrant remand. Listing 1.08 covers soft tissue injuries like burns. There is no discussion of burns or other soft tissue damage in the ALJ's opinion; rather, the ALJ discussed a joint injury and assessed Plaintiff's ambulation, indicating that he applied Listing 1.02. R. at 13–14. And in any case, an ALJ need not explicitly discuss a particular Listing. Solis v. Berryhill, 692 F. App'x 46, 49 (2d Cir. 2017). Rather, an ALJ's general opinion that a plaintiff did not meet a listed impairment must be supported by substantial evidence. Id.

As to Plaintiff's second argument, that she satisfies Listing 1.02 because she cannot walk without a walker or crutches, Pl. Br. at 7, she relies primarily on Dr. Anderson's October 2014 statement that Plaintiff "could only walk with a walker or crutches" "since the day of the accident," and that he was "quite sure" that Plaintiff could not handle any work that involved anything more than brief standing and walking and that "standing and walking would require a walker or two crutches." Pl. Br. at 4, 7–13; R. at 505.

14

The SSA's "treating physician" rule mandates that the medical opinion of a claimant's treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial record evidence. Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000), citing 20 C.F.R. 416.927(d)(2). However, if the doctor in question did not treat the claimant within the period in contention, he does qualify as a "treating physician" during that period because "he was not in a unique position to make a complete and accurate diagnosis." Monette v. Astrue, 269 F. App'x 109, 112–13 (2d Cir. 2008) (internal quotation marks and citations omitted). However, that "does not mean that [a retrospective] opinion should not be given some, or even significant, weight." Id. For example, "[a] treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques." Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996). Indeed, "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." Byam v. Barnhart, 336 F.3d 172, 183 (2d Cir. 2003) (citing Rivera v. Sullivan, 923 F.2d 964, 968 (2d Cir. 1991); cf. Monette, 269 Fed. App'x at 113 ("We identify no error in the ALJ's refusal to accord [the treating physician's] retrospective opinion significant weight because there is substantial evidence that the opinion is contradicted by other evidence."). The ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion," Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004), and failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician constitutes grounds for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

If an ALJ does not grant a medical opinion controlling weight, he must still weigh the opinion based on the following factors: (1) whether the physician has examined the plaintiff; (2) the treatment relationship (such as length, frequency, and nature of treatment); (3) supportability of the opinion; (4) consistency of the opinion with the record; and (5) whether the physician is a specialist. § 404.1527

Here, the ALJ considered Dr. Anderson a "treating orthopedist," and gave his October 2014 report "considerable weight." R. at 16. But despite this "considerable weight," the ALJ proceeded to not credit that October 2014 report's finding that Plaintiff had only been able to walk with a walker or crutches since the time of the crash. Id. The ALJ offered no rationale for rejecting Dr. Anderson's finding regarding the walker, aside from the fact that his opinion was rendered two years after the disputed period, a fact that didn't prevent the ALJ from giving the opinion "considerable weight." Id. The ALJ failed to point to any medical evidence contradicting Dr. Anderson's retrospective opinion on the necessity of walkers. Id. The ALJ provided no "good reasons" Snell, 177 F.3d at 133, for rejecting the October 2014 assessment.

Defense counsel here raises a number of possible reasons for the ALJ to not accept the October 2014 retrospective assessment regarding walkers. Def.'s Br. at 4–8. For example, medical notes recorded prior to and after the relevant disability period that do not mention walkers or crutches, but instead other assistive devices. Id. at 406 (ASO brace); 398 (lace-up brace); 409 (CAM boot). On the other hand, the October 2014 retrospective opinion is largely in keeping with the September 2013 Dr. Baird opinion, and January 2014 opinions by Drs. Williams and Anderson. Id. at 496–98 (Baird), 427–28 (Williams), 429 (Anderson). The ALJ did not analyze Dr. Anderson's October 2014 opinion in the context of these other opinions, let alone

articulate "good reasons" for rejecting the October 2014 opinion; "post hoc rationalizations," like those reasonable ones brought forward in the Defendant's Brief, are insufficient to retroactively make the ALJ's opinion legally satisfactory. Newbury v. Astrue, 321 F. App'x 16, 18 (2d Cir.2009) (internal quotation marks omitted). The ALJ must do the job.

Here, the ALJ did not offer good reasons for rejecting Dr. Anderson's October 2014 retrospective assessment of Plaintiff's ambulation. As failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician constitutes legal error requiring remand, Snell, 177 F.3d at 133, the Court remands for further proceedings consistent with this Memorandum-Decision and Order.

### B.      The ALJ's Treatment of Dr. Anderson's Retrospective Opinions

Plaintiff argues that the ALJ erred in failing to properly evaluate and weigh Dr. Anderson's January and October 2014 opinions. Pl. Br. at 4, 7–13; R. at 505.

As explained earlier, in January 2014, just over a year after the relevant period, Dr. Anderson detailed how Plaintiff had a "30% impairment rating," could not walk or stand for any length of time or lift, and then stated that he "th[ought] that [Plaintiff's] impairment really began at the time of her motor vehicle accident." R. at 429.

Later, in the October 2014 statement discussed above, Dr. Anderson explained that Plaintiff "could only walk with a walker or crutches" "since the day of the accident." Pl. Br. at 4, 7–13; R. at 505. Dr. Anderson said "quite sure" that Plaintiff would not have been able to handle any work that involved anything more than brief standing and walking and that "standing and walking would require a walker or two crutches." Pl. Br. at 4, 7–13; R. at 505.

As discussed above, the ALJ did not provide "good reasons" for rejecting Dr. Anderson's October 2014 opinion. Likewise, the ALJ failed to properly assess Dr. Anderson's January 2014 opinion.

In both his January and October opinions, Dr. Anderson's assessment included a retrospective component. In the January 2014 opinion, Dr. Anderson detailed how Plaintiff could not walk or stand for any length of time or lift, and then stated that he "th[ought] that [Plaintiff's] impairment really began at the time of her motor vehicle accident." R. at 429. However, the ALJ "did not find that [the January 2014 opinion] sheds any particular light on the claimant's functional capacities prior to her date last insured." Id. at 16. Rather, without citing any evidence aside from the fact that the amputation occurred in April 2014, the ALJ determined that Plaintiff's condition was "likely" at its worst in January 2014, and therefore that the opinion from that month did not shed any light on the period in dispute. R. at 16. However, the severity of a claimant's impairments is a medical question, and the "opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013). An ALJ may not substitute his own lay opinion in place of medical testimony, Id. at 419, as the ALJ did here.

Given that the ALJ failed to cite any evidence for the finding that Plaintiff's injury was likely at its worst in January 2014 and not, as Dr. Anderson suggests, representative of her condition during the relevant period, the ALJ failed to articulate any "good reason" to conclude that the January 2014 opinion should not be given some weight in assessing Plaintiff's state in the relevant period. The ALJ did not explain how Dr. Anderson's January 2014 opinion was

contradicted by other evidence in the record, nor did it state that Dr. Anderson's findings were not based on clinically acceptable diagnostic techniques. The ALJ did not "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33. The ALJ's failure to articulate good reasons for discounting Dr. Anderson's January 2014 medical opinion constitutes legal error, which requires remand. See Snell, 177 F.3d at 133.

As Defendant notes, there is some evidence in the record that Plaintiff's injury worsened over time, and that the January 2014 moment may not have been representative of the relevant period. Def.'s Br. at 10–11. For example, in March 2012, prior to the relevant period, Dr. Boppana reported that Plaintiff's ankle injury was "managed with splint and pain meds," R. at 387, in contrast to late 2013 reports indicating the use of a walker. Id. at 496–98. In June 2013, Plaintiff sought treatment for "*worsening* neuropathy in right leg," Id. at 462 (emphasis added). And in December 2013, Plaintiff reported "*increasing* right foot pain." Id. at 499–500 (emphasis added). On the other hand, portions of the September 2013 Dr. Baird opinion, the January 2014 Dr. Williams opinion, and the October 2014 Dr. Anderson opinion accord with the January 2014 Dr. Anderson opinion in suggesting that Plaintiff's level of impairment was consistent from 2010. Id. at 427, 496–97. But the ALJ in his opinion did not analyze the medical evidence on this question. And "post hoc rationalizations for agency action" are not sufficient to support an ALJ's decision. Newbury, 321 F. App'x at 18.

In his assessment of the January 2014 Dr. Anderson opinion, the ALJ also summarily found that the thirty percent impairment rating detailed there would not suggest that an individual was "incapable of performing work activity, particularly that of sedentary nature." Id. at 16. Again, the ALJ did not explain or cite any evidence in support of this finding. Id. Nor did the

ALJ assess the thirty percent impairment's impact on residual functional capacity in the context of Dr. Anderson's other comments; for example, that Plaintiff "would have a lot of trouble getting through an eight hour day," "would probably have a lot of intermittent loss of time," "would most likely require pain medication which would affect her concentration," and "would probably miss more than four days a month very easily." Id. at 429.

The ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion," Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004), and failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician constitutes grounds for remand. Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). Accordingly, the Court "conclude[s] that further proceedings are required because, given the record as it had in fact been developed, the ALJ did not provide an adequate explanation for his rejection of" Dr. Anderson's January and October 2014 opinions. Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527).

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that this case is **REMANDED** for further proceedings consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      September 28, 2018
                 Albany, New York


Lawrence E. Kahn
U.S. District Judge